# EXHIBIT A

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*

Mark Owens Jordan
2830 Lone Tree Way
Antioch, CA 94509

TELEPHONE NO.: 925.757.8080          FAX NO. *(Optional):* 925.757.8582
ATTORNEY FOR *(Name):* Pro Per

FOR COURT USE ONLY

2020 JUN -1 P 1:01

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Contra Costa
STREET ADDRESS: 725 Court Street
MAILING ADDRESS:
CITY AND ZIP CODE: Martinez, CA 94553
BRANCH NAME: Wakefield Taylor Courthouse

CASE NAME:
Jordan v. City of Antioch

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: C20-00976 |
|---|---|---|
| [x] Unlimited (Amount demanded exceeds $25,000)   [ ] Limited (Amount demanded is $25,000) | [ ] Counter   [ ] Joinder <br> Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: <br> DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[x] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [x] punitive
4. Number of causes of action *(specify):* 3
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 10-1-2000

Mark Owens Jordan
*(TYPE OR PRINT NAME)*                              *(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)*

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
**CIVIL CASE COVER SHEET**
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

2020 JUN -1 P 1:01

CLERK OF ___ COURT ___ COUNTY ___ ,CA

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
CITY OF ANTIOCH, AGENERAL LAW CITY IN THE STATE OF CALIFORNIA

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

MARK OWENS JORDAN, AN INDIVIDUAL

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: <br> *(El nombre y dirección de la corte es):* SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF CONTRA COSTA <br> 725 COURT STREET, MARTINEZ, CA 94553 | CASE NUMBER: *(Número del Caso):* <br> **C20-00976** |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
MARK JORDAN, 2830 LONE TREE WAY, ANTIOCH, CA  94509   925.757.8080

| DATE: **JUN - 1 2020** <br> *(Fecha)* | Clerk, by **B. POOL** <br> *(Secretario)* | , Deputy <br> *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010).)*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date)*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

Mark Owens Jordan
dba: Jordan & Associates
dba: RE/MAX Preferred Properties
BRE 00676018
2830 Lone Tree Way
Antioch, CA 94509
Tel: (925)757-8080
Fax: (925)757-8582

Pro Per

2020 JUN -1 P 1:01

CLERK
COUNTY
CA COURT
CA

PER LOCAL RULE, THIS
CASE IS ASSIGNED TO
DEPT _____, FOR ALL
PURPOSES

SUMMONS ISSUED

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF CONTRA COSTA

| | |
|---|---|
| MARK OWENS JORDAN, AN INDIVIDUAL<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF ANTIOCH, A GENERAL LAW CITY IN THE STATE OF CALIFORNIA<br><br>Defendant | Case No.: **C20 - 00976**<br><br>COMPLAINT FOR PRELIMINARY INJUNCTION, PERMANENT INJUCTION, PUNITIVE DAMAGES AND OTHER EQUITABLE RELIEF |

Mark Owens Jordan ("Plaintiff") alleges as follows:

### I. PLAINTIFF

1. Plaintiff brings this action against City of Antioch ("Defendant") for permanent injunctive relief, punitive damages and other equitable relief as the Court may find applicable concerning Defendant's illegal actions taken as and by the Antioch City Council on March 31, 2020.

2. Plaintiff is a citizen of the State of California, County of Contra Costa, City of Antioch and an owner of commercial and residential property. Therefore; Plaintiff has proper standing to bring this complaint.

COMPLAINT FOR PRELIMINARY INJUNCTION, PERMANENT INJUCTION, PUNITIVE DAMAGES AND OTHER EQUITABLE RELIEF - 1

## II. DEFENDANT

3.  Defendant is a general law City, empowered and limited in action by the State of California.  Defendant has a five member Council with a Mayor who is first among equals acting as the executive and legislative body of the City of Antioch.

## III. JURISDICTION AND VENUE

4.  Venue is proper in this county as Plaintiff resides in this county and the Defendant is located in this county.  This Court has jurisdiction pursuant to the California Constitution.

## IV. BACKGROUND

5.  Currently there exists within the world, including the United States of America, a virus pandemic.  There exist within the State of California and County of Contra Costa, a health directive to shelter in place.  On March 16, 2020, Governor, Gavin Newsom issued Executive Order N-28-20 to halt evictions, slow foreclosures and protect against utility shut offs. (EXHIBIT I)  The California Constitution and all of its provisions have not been suspended by Executive Order or any act by the legislature.

6.  On March 31, 2020 the City Council of the City of Antioch, California passed an Urgency Ordinance.  A Moratorium on Temporary Evictions for real property was the initial hearing title.  As part of this Urgency Ordinance the Council of the City of Antioch included a modification to Section 3.F.  This modification included a 90-day grace period per month of rental payment arrears after expiration or other termination of the ordinance.  (EXHIBIT II)

## V.  GENERAL ALLEGATIONS

Plaintiff is informed and believes and based thereon alleges as follows:

COMPLAINT FOR PRELIMINARY INJUNCTION, PERMANENT INJUCTION, PUNITIVE DAMAGES AND OTHER EQUITABLE RELIEF - 2

7.   Defendant is in violation of the United State Constitution, Articles 5 and 14 in that Defendant's action does not provide due process and equal protection under the law. Defendant holds no authority by virtue of the Constitution of the United States to interfere in private contract matters.  Defendant's actions are arbitrary and oppressive to property owners in favor of tenants and therefore are by their very nature illegal and unenforceable.  The requirements and enforcement is not uniform and equal and therefore Plaintiff states that individual rights stand superior and not subordinate to the action of the Municipality.  Defendant has no proof the action provides for the "common good" or are equally applied without causing injustice, oppression or absurd consequence.  (Henning Jacobson v. Commonwealth of Massachusetts).  (EXHIBIT III)

8.   Defendant is in violation of the California State Constitution, Article I, Sections 1-32 inclusive.  Defendant has specifically and onerously violated Article I, Section 9 in that Defendant through the City Councils action did knowingly pass a law impairing the obligation of a private contract.

9.   Defendant has no authority or capacity in law or equity to create private work out payment plans for other parties; private parties.  Defendant has no authority or capacity to dictate to private parties a 90-day grace period per month for rental repayment at any time; or extending beyond the expiration of any Urgency Ordinance or Executive Order.

10.  The resolution power for disputes between private parties and private contracts is not the legislative or executive branches of government, but the judicial branch. Defendant seeks to strip the judiciary of their power and authority to determine what is fair and equitable between contracting private parties.  Defendant is without capacity or authority from the State of California in the action taken.

COMPLAINT FOR PRELIMINARY INJUNCTION, PERMANENT INJUCTION, PUNITIVE DAMAGES AND OTHER EQUITABLE RELIEF - 3

11.  Defendant's Council Members knowingly took this action and in doing so violated their oath of public office and should be admonished by the Court for this criminal activity.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Violation of United States Constitutional Rights

12.  The United States Constitution, Bill of Rights, Article 5 requires government to provide due process.  Plaintiff is informed and believes and thereon alleges that Defendant has violated Plaintiffs right to due process.  Defendant's action implementing the noted Urgency Ordinance is arbitrary and oppressive.  It leads to injustice, oppression and absurd consequence. It sets aside provisions of private contracts for the benefit of only one party and flies in the face of nearly two hundred and fifty years of contract law in the United States of America.  Defendant is also in violation of Article 14 in that Defendant is denying Plaintiff equal protection under the law.

13.  In (Henning Jacobson v. Commonwealth of Massachusetts) the issue at hand was a direct matter concerning health involving the mandatory vaccination to eradicate small pox and the epidemic.  Ruling that because it was a mandatory vaccination for all citizens the court decided it was not arbitrary or oppressive.  The Municipal power is limited.

14.  Defendant's Notice of Council meeting was relative to suspending evictions for residential and commercial property, but Council Members representing the City of Antioch amended the proposal to include an illegal 90-day per month deferred rental payment workout not noticed to the general public.  This provision, lack of notice and violation of the United State Constitution should render the entire Ordinance illegal and unenforceable.

COMPLAINT FOR PRELIMINARY INJUNCTION, PERMANENT INJUCTION, PUNITIVE DAMAGES AND OTHER EQUITABLE RELIEF - 4

## SECOND CAUSE OF ACTION

### Violation of California Constitutional Rights

15. Defendant, by virtue of the implementation of the Urgency Ordinance has violated Plaintiff's California Constitutional Rights. Defendant's Notice of Council meeting was relative to suspending evictions for residential and commercial property, but Council Members representing the City of Antioch amended the proposal at the meeting to include an illegal 90-day per month deferred rental payment workout not noticed to the general public. This provision, lack of notice and violation of the United State Constitution should render the entire Ordinance illegal and unenforceable.

16. Defendant is in violation of the California State Constitution, Article I, Sections 1-32 inclusive. Defendant has specifically and onerously violated Article I, Section 9 in that City Council Members did knowingly pass a law "impairing the obligation of a contract".

17. The California Constitution remains in full force and effect for the protection of all the citizens of the State. There exists no Executive Order suspending any provisions of the California State Constitution.

18. Defendant therefore, by act of City Council Members denied Plaintiff due process and equal protection under the law as required by the California State Constitution.

## THIRD CAUSE OF ACTION

### Exceeding Authority, Lack of Capacity, Criminal Conduct

19. All power rest with the states except those retained by the federal government. No power in the State of California exists for counties, municipalities or towns not granted to them by the State of California.

COMPLAINT FOR PRELIMINARY INJUNCTION, PERMANENT INJUCTION, PUNITIVE DAMAGES AND OTHER EQUITABLE RELIEF - 5

20.   There exists no state law or order which would grant to the Defendant the authority or capacity to modify, invalidate or change a private civil contract to which Defendant is not a party.  Defendant has no capacity or authority to implement the Urgency Ordinance as amended.

21.   The power to change, modify or cancel a private civil contract is only between the contracting parties by mutual agreement.  The power to judge or invalidate a private civil contract or to determine the degree of lawfulness or fairness rests only with the judiciary. The power to judge what may or may not be a fair and equitable workout for unpaid or deferred rent rests only with the judiciary.

22. City Council Members acting for and on behalf of the Defendant have by their own action and vote, violated their oaths of office.  Plaintiff alleges this is a criminal offense.

### VII. PUNITIVE DAMAGES

23.  The conduct of Defendant described above is outrageous. Defendant's conduct by the City Council Members demonstrates a reckless disregard for the basic law of the United States of America and the State of California. The acts described above were willful and performed with actual or implied malice, foreknowledge and forethought. The actions were arbitrary and oppressive.  Punitive and exemplary damages are therefore appropriate and should be imposed in this instance.

### VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for a judgment against Defendant for:

COMPLAINT FOR PRELIMINARY INJUNCTION, PERMANENT INJUCTION, PUNITIVE DAMAGES AND OTHER EQUITABLE RELIEF - 6

1. An Order requiring Defendant to show cause, if any Defendant has, why Defendant should not be enjoined as hereinafter set forth, during the pendency of this action.

2. An immediate Preliminary Injunction enjoining the Defendant's Urgency Ordinance passed on March 31, 2020

3. A Permanent Injunction requiring Defendants to comply with the Laws of the United States and the State of California, which Defendant is alleged to have violated;

4. A Permanent Injunction rendering the entire City of Antioch Urgency Ordinance passed on March 31, 2020 by the Defendant void, illegal and unenforceable;

5. A referral to the Attorney General, of the State of California concerning the criminal conduct of the Council Members of the City of Antioch as the Court deems appropriate and in the interest of justice;

6. Reimbursement by Defendant for Plaintiff's costs, fees and time as may be accounted, with interest;

7. Civil penalties in the form of punitive damages as the court deems appropriate,:  all of which Plaintiff shall donate to charity or direct as a pay-down of the PERS unfunded retirement liability existing for the City of Antioch;

8. Attorneys fees of this lawsuit, with interest, should any be incurred by Plaintiff;

9. Any other relief as the Court deems appropriate and in the interest of justice.

Dated: 5-28-2020

Mark Owens Jordan

Pro Per

COMPLAINT FOR PRELIMINARY INJUNCTION, PERMANENT INJUNCTION, PUNITIVE DAMAGES AND OTHER EQUITABLE RELIEF - 7

# EXHIBIT I

EXECUTIVE DEPARTMENT
STATE OF CALIFORNIA

### EXECUTIVE ORDER N-28-20

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** despite sustained efforts, the virus remains a threat, and further efforts to control the spread of the virus to reduce and minimize the risk of infection and otherwise mitigate the effects of COVID-19 are needed; and

**WHEREAS** the economic impacts of COVID-19 have been significant, and could threaten to undermine Californians' housing security and the stability of California businesses; and

**WHEREAS** many Californians are experiencing substantial losses of income as a result of business closures, the loss of hours or wages, or layoffs related to COVID-19, hindering their ability to keep up with their rents, mortgages, and utility bills; and

**WHEREAS** Californians who are most vulnerable to COVID-19, those 65 years and older, and those with underlying health issues, are advised to self-quarantine, self-isolate, or otherwise remain in their homes to reduce the transmission of COVID-19; and

**WHEREAS** because homelessness can exacerbate vulnerability to COVID-19, California must take measures to preserve and increase housing security for Californians to protect public health; and

**WHEREAS** local jurisdictions, based on their particular needs, may therefore determine that additional measures to promote housing security and stability are necessary to protect public health or to mitigate the economic impacts of COVID-19; and

**WHEREAS** local jurisdictions may also determine, based on their particular needs, that promoting stability amongst commercial tenancies is also conducive to public health, such as by allowing commercial establishments to decide whether and how to remain open based on public health concerns rather than economic pressures, or to mitigate the economic impacts of COVID-19; and

**WHEREAS** many utility providers, public and private, covering electricity, gas, water, and sewer, have voluntarily announced moratoriums on service disconnections and late fees for non-payment in response to COVID-19; and

**WHEREAS** many telecommunication companies, including internet and cell phone providers, have voluntarily announced moratoriums on service disconnections and late fees for non-payment in response to COVID-19;

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567 and 8571, do hereby issue the following order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1) The time limitation set forth in Penal Code section 396, subdivision (f), concerning protections against residential eviction, is hereby waived. Those protections shall be in effect through May 31, 2020.

2) Any provision of state law that would preempt or otherwise restrict a local government's exercise of its police power to impose substantive limitations on residential or commercial evictions as described in subparagraphs (i) and (ii) below—including, but not limited to, any such provision of Civil Code sections 1940 et seq. or 1954.25 et seq.—is hereby suspended to the extent that it would preempt or otherwise restrict such exercise. This paragraph 2 shall only apply to the imposition of limitations on evictions when:

　　(i)　The basis for the eviction is nonpayment of rent, or a foreclosure, arising out of a substantial decrease in household or business income (including, but not limited to, a substantial decrease in household income caused by layoffs or a reduction in the number of compensable hours of work, or a substantial decrease in business income caused by a reduction in opening hours or consumer demand), or substantial out-of-pocket medical expenses; and

　　(ii)　The decrease in household or business income or the out-of-pocket medical expenses described in subparagraph (i) was caused by the COVID-19 pandemic, or by any local, state, or federal

occupation thereof, to which a local government has imposed a limitation on eviction pursuant to this paragraph 2, and only to the extent of the limitation imposed by the local government.

Nothing in this Order shall relieve a tenant of the obligation to pay rent, nor restrict a landlord's ability to recover rent due.

The protections in this paragraph 2 shall be in effect through May 31, 2020, unless extended.

3) All public housing authorities are requested to extend deadlines for housing assistance recipients or applicants to deliver records or documents related to their eligibility for programs, to the extent that those deadlines are within the discretion of the housing authority.

4) The Department of Business Oversight, in consultation with the Business, Consumer Services, and Housing Agency, shall engage with financial institutions to identify tools to be used to afford Californians relief from the threat of residential foreclosure and displacement, and to otherwise promote housing security and stability during this state of emergency, in furtherance of the objectives of this Order.

5) Financial institutions holding home or commercial mortgages, including banks, credit unions, government-sponsored enterprises, and institutional investors, are requested to implement an immediate moratorium on foreclosures and related evictions when the foreclosure or foreclosure-related eviction arises out of a substantial decrease in household or business income, or substantial out-of-pocket medical expenses, which were caused by the COVID-19 pandemic, or by any local, state, or federal government response to COVID-19.

6) The California Public Utilities Commission is requested to monitor measures undertaken by public and private utility providers to implement customer service protections for critical utilities, including but not limited to electric, gas, water, internet, landline telephone, and cell phone service, in response to COVID-19, and on a weekly basis publicly report these measures.

Nothing in this Order shall be construed to invalidate any limitation on eviction enacted by a local jurisdiction between March 4, 2020 and this date.

Nothing in this Order shall in any way restrict state or local authority

**I FURTHER DIRECT** that as soon as hereafter possible, this proclamation be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 16th day of March 2020.

GAVIN NEWSOM
Governor of California

**ATTEST:**

_____

ALEX PADILLA
Secretary of State

# EXHIBIT II

## URGENCY ORDINANCE NO. 2182-C-S

## AN URGENCY ORDINANCE OF THE CITY OF ANTIOCH ENACTING A TEMPORARY MORATORIUM ON EVICTIONS DUE TO NONPAYMENT OF RENT FOR RESIDENTIAL AND COMMERCIAL TENANTS WHERE THE FAILURE TO PAY RENT RESULTS FROM INCOME LOSS RESULTING FROM THE NOVEL CORONAVIRUS DISEASE 2019 (COVID-19)

**WHEREAS**, governments and public health professionals around the world have detected and are actively responding to the outbreak of the novel coronavirus disease 2019 (the "**Coronavirus**" or "**COVID-19**"), a potentially life-threatening infectious disease that causes respiratory illness with fever, coughing, and/or difficulty breathing and for which there is currently no known natural immunity or vaccine;

**WHEREAS**, on January 30, 2020, the International Health Regulations Emergency Committee of the World Health Organization declared the Coronavirus outbreak a public health emergency of international concern;

**WHEREAS**, on March 4, 2020, the California Governor Gavin Newsom proclaimed a state of emergency in California as a result of the threat of the Coronavirus;

**WHEREAS**, on March 10, 2020, Contra Costa County proclaimed a local emergency caused by the introduction of Coronavirus and its contribution to the shortage of essential health care supplies;

**WHEREAS**, on March 13, 2020, the President of the United States declared a national emergency due to the Coronavirus;

**WHEREAS,** on March 14, 2020, Contra Costa County Health Officer issued an order prohibiting mass gatherings of 100 or more persons and as defined in the order;

**WHEREAS,** on March 16, 2020, pursuant to California Health and Safety Code sections 101040 and 120175, seven health officers within six Bay Area counties, including Contra Costa County, issued a legal order directing their respective residents to shelter at home for three weeks beginning March 17, 2020 in an effort to reduce and slow the spread of the Coronavirus by limiting activity, travel and business functions to only the most essential needs;

**WHEREAS,** on March 16, 2020, California Governor Gavin Newsom issued Executive Order N-28-20 ordering waiver of time limitations set forth in Penal Code section 396(f) concerning protections against residential evictions, and suspending any provision of state law that would preempt or otherwise restrict a local government's exercise of its police power to impose substantive limitations on residential or commercial evictions related to the Coronavirus. The order further suspended statutory causes of action for judicial foreclosure, including Code of Civil Procedure section 725a et seq., the statutory cause of action for unlawful detainer, Code of Civil Procedure

section 1161 et seq., and any other statutory cause of action that could be used to evict or otherwise eject a residential tenant or occupant of residential real property after foreclosure;

**WHEREAS**, on March 17, 2020, pursuant to Section 4-2.06(A)(1) of the Antioch Municipal Code, the Director of Emergency Services proclaimed a local emergency;

**WHEREAS**, on March 24, 2020 the City Council of the City of Antioch ratified the proclamation of the Director of Emergency services and proclaimed that a local emergency exists and shall continue to exist in the City of Antioch until the City Council resolves that the local emergency is terminated;

**WHEREAS,** on March 19, 2020, California Governor Gavin Newsom issued Executive Order N-33-20 ordering all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operation of the federal critical infrastructure sectors, critical government services, schools, and construction, including housing construction;

**WHEREAS,** on March 26, 2020, the New York Times reported that the United States has the world's most reported Coronavirus cases with 81,321 and over 1,000 deaths have been linked to the Coronavirus in the United States;

**WHEREAS,** both large and small events across the Bay Area and in Antioch are being canceled or postponed due to the County and State Orders and recommendations at all levels of government to cancel large gatherings due to concerns about the spread of the virus;

**WHEREAS,** cancellations and postponements of conferences, events, activities, and meetings cause loss of revenue for businesses that rely on such gatherings to provide demand for their products and services;

**WHEREAS,** the California Constitution, Article XI, Section 7, provides cities and counties with the authority to enact ordinances to protect the health, safety, and general welfare, of their citizens;

**WHEREAS,** California Government Code Section 36937 authorizes the City Council to introduce and adopt an ordinance it declares to be necessary as an emergency measure to preserve the public peace, health, and safety at one and the same meeting if passed by at least four-fifths affirmative votes;

**WHEREAS,** this Ordinance is a temporary moratorium intended to promote stability and fairness within the residential and commercial rental market in the City during the Coronavirus pandemic outbreak, and to prevent avoidable homelessness and evictions thereby serving the public peace, health, safety, and public welfare and to

enable tenants in the City whose income and ability to work is affected due to the Coronavirus to remain in their homes;

WHEREAS, displacement through eviction destabilizes the living situation of tenants and impacts the health of Antioch residents and businesses by interfering with and disrupting employment, schooling, business relationships, and social networks that are important to citizens' welfare and the stability of communities within the City of Antioch;

WHEREAS, displacement through eviction creates undue hardship for tenants through additional relocation costs, and during the Coronavirus pandemic outbreak, affected tenants who have lost income due to impact on the economy or their employment may be at risk of homelessness if they are evicted for non-payment as they will have little or no income and thus be unable to secure other housing if evicted;

WHEREAS, housing instability threatens the public peace, health, and safety as eviction from one's home can lead to prolonged homelessness, the inability to remain gainfully employed, strain on social services, stress and anxiety experienced by those displaced, interruption of the education of children in the home; and increased exposure to, and spreading of the Coronavirus;

WHEREAS, businesses affected by the Coronavirus and may be unable to pay rent and, therefore, may be evicted resulting in negative impact on the local economy through layoffs, lost income and healthcare for employees, lost products and services for residents, and increased risk of life-threatening COVID-19 exposure;

WHEREAS, the City Council finds and determines that regulating the relations between residential and commercial landlords and tenants is essential to preventing the spread of the Coronavirus in the City and thereby serve the public peace, health, and safety; and

WHEREAS, an urgency ordinance that is effective immediately is necessary to avoid the immediate threat to public peace, health, and safety as failure to adopt this urgency ordinance would result in the avoidable displacement or exposure to the Coronavirus of the City's residents and community members and to the amplification of the factors that lead to the spread of the virus, as described in these Recitals.

**NOW, THEREFORE, THE CITY COUNCIL OF THE CITY OF ANTIOCH, DOES HEREBY ORDAIN AS FOLLOWS:**

**Section 1.  Incorporation of Recitals.**
The City Council of the City of Antioch hereby finds that all of the Recitals are true and correct and incorporated herein by reference.   The provisions of the Governor's

Executive Order N-28-20, including its recitals, are incorporated by reference in their entirety herein.

**Section 2.  Urgency Findings.**
The City Council of the City of Antioch hereby finds that there is a current and immediate threat to the public health, safety and/or welfare and a need for immediate preservation of the public peace, health, or safety that warrants this urgency measure. This finding is based upon the facts stated in the Recitals above, the staff report dated March 31, 2020, as well any oral and written testimony at the March 31, 2020 City Council meeting.

This Ordinance and any moratorium that may be established hereunder is declared by the City Council to be an urgency measure necessary for the immediate preservation of the public peace, health or safety.  The facts constituting such urgency are all of those certain facts set forth and referenced in this Ordinance and the entirety of the record before the City Council.

**Section 3.  Moratorium on Eviction for Nonpayment of Rent during the COVID-19 Emergency.**

A.  During the term of this Ordinance, no landlord shall endeavor to evict a residential or commercial tenant for nonpayment of rent, including but not limited to any such action under Civil Code sections 1940 et seq. or 1954.25 et seq., if the tenant provides written documentation or other objectively verifiable proof evidencing the following:

1.    The tenant's inability to pay rent is was caused by, or arises out of, a substantial decrease in household or business income (including but not limited to the circumstances described in subsections B or C) or substantial out-of-pocket medical expenses; and

2.    The decrease in household income, or out-of-pocket medical expenses, was caused by the COVID-19 pandemic, or by any local, state, or federal government response to COVID-19.

B.  "**Substantial decrease in household income**" includes but is not limited to loss of income caused by COVID-19 illness or caring for a household or family member with COVID-19 illness, work closures, layoffs, job loss, a reduction in the number of compensable hours or other economic or employer impacts of COVID-19, including missing work due to a minor child's school closure, compliance with government health authority orders, or a similarly-caused reason resulting in loss of household income due to COVID-19, that is substantiated with written documentation.

C.  "**Substantial decrease in business income**" includes, but is not limited to, loss of income caused by work closures, reduction in staff reporting to work, reduction in opening hours, or reduction in consumer demand, compliance with government health authority orders, or other similarly caused reason resulting in loss of business income due to COVID-19, substantiated with written documentation or other objectively verifiable proof of same.

D.  A landlord that knows that a tenant cannot pay some or all of the rent temporarily for the reasons set forth above shall not serve a notice pursuant to Civil Code of Procedure section 1161, file or prosecute an unlawful detainer action based on a three-day pay or quit notice, or otherwise seek to evict for nonpayment of rent.

E.  The City encourages tenants to inform landlords in writing of their inability to pay full rent as soon as practicable after they become aware of a substantial decrease in household income or business income or out-of-pocket medical expenses that would prevent them from paying full rent. A landlord knows of a tenant's inability to pay rent within the meaning of this Ordinance if the tenant, within 14 days after the date that rent is due, notifies the landlord in writing of the tenant's inability to pay the full rent because a substantial decrease in household or business income or the need to pay out-of-pocket medical expenses was caused by the COVID-19 pandemic, or by any local, state, or federal government response to COVID-19, and provides documentation to support the claim. Any medical or financial information provided to the landlord shall be held in confidence, and only used for evaluating the tenant's claim. For purposes of this Ordinance, "**in writing**" includes email or text communications to a landlord or the landlord's representative with whom the tenant has previously corresponded by email or text.

F.  Nothing in this Ordinance relieves the tenant of liability for the unpaid rent, which the landlord may seek after the expiration of this Ordinance, affected residential and affected commercial tenants shall receive a ninety (90) day grace period per month of arrears after expiration or other termination of the term of this Ordinance during which to repay any monies due to a landlord for failure to pay rent or utilities, unless a state law or order is amended or adopted providing for a longer repayment period, in which case the payment period provided by the state law or order shall apply under this Ordinance.

G.  A landlord may not charge or collect a late fee or any other new fees for rent that is delayed for the reasons stated in this Ordinance, nor may a landlord seek rent that is delayed for the reasons stated in this Ordinance through the eviction process.

H.  This Ordinance may be asserted as an affirmative defense in any unlawful detainer action or other action brought by an owner or landlord to recover possession.  A tenant may bring a civil suit seeking owner or landlord compliance with any provisions of this Ordinance.

I.  This Ordinance applies to nonpayment eviction notices and unlawful detainer actions based on such notices, served or filed on or after March 16, 2020 and until the expiration of this Ordinance, as set forth in Section 7, below.

J.  Courts shall have the sole discretion to determine in an unlawful detainer action or other eviction action whether the tenant's written notice and documentation are

sufficient to show a "**substantial decrease in household**" or "**substantial out-of-pocket medical expenses**."

**Section 4.  Moratorium on Judicial Foreclosures during the COVID-19 Emergency.**
As provided for in Executive Order N-28-20 and consistent with the other provisions in this Ordinance, the statutory cause of action for judicial foreclosure, Code of Civil Procedure section 725a et seq.; the statutory cause of action for unlawful detainer, Code of Civil Procedure section 1161 et seq.; and any other statutory cause of action that could be used to evict or otherwise eject a residential or commercial tenant or occupant of residential real property after foreclosure is hereby suspended as applied to any tenancy, or residential real property and any occupation thereof, to which a limitation on eviction is imposed pursuant to this Ordinance.

**Section 5.  Compliance with the California Environmental Quality Act.**
The City Council hereby finds approval of this Ordinance is exempt from the California Environmental Quality Act (Public Resources Code §§ 21000et seq., "**CEQA**," and 14 Cal. Code Reg. §§ 15000 et seq., "**CEQA Guidelines**") under Section 15061(b)(3) of the CEQA Guidelines.

**Section 6.  Severability.**
If any section, subsection, sentence, clause or phrase of this chapter is for any reason held to be invalid or unconstitutional by a decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this chapter. The City Council hereby declares that it would have passed the ordinance codified in this chapter, and each and every section, subsection, sentence, clause or phrase not declared invalid or unconstitutional without regard to whether any portion of this chapter would be subsequently declared invalid or unconstitutional.

**Section 7.  Effective Date and Publication.**
This Urgency Ordinance shall become effective immediately upon its adoption by not less than a four-fifths vote of the Antioch City Council pursuant to California Government Code Section 36937 and shall remain in effect until May 31, 2020 or the expiration of the local emergency or the Governor's proclamation of a state of emergency, whichever is later.  Prior to the expiration of fifteen days from the passage thereof, the ordinance or a summary thereof shall be posted or published as may be required by law.

THE FOREGOING URGENCY ORDINANCE was INTRODUCED, ADOPTED AND ORDERED published at a special meeting of the City Council held on March 31, 2020 and passed by the following vote:

**AYES:**      **Council Members Wilson, Thorpe, Ogorchock, Motts & Mayor Wright**

**NOES:**      **None**

**ABSENT:**    **None**

**ABSTAIN:**   **None**

_____   _____
Sean Wright, Mayor of the City of Antioch

ATTEST:

_____
Arne Simonsen, City Clerk of the City of Antioch

# EXHIBIT III

Supreme Court
- about
- search
- liibulletin
- subscribe
- previews

# HENNING JACOBSON, , v. COMMONWEALTH OF MASSACHUSETTS.

**197 U.S. 11** (25 S.Ct. 358, 49 L.Ed. 643)

HENNING JACOBSON, Plff. in Err., v. COMMONWEALTH OF MASSACHUSETTS.

No. 70.

Argued: December 6, 1904.

Decided: February 20, 1905.

- **opinion**, Harlan [HTML]

This case involves the validity, under the Constitution of the United States, of certain provisions in the statutes of Massachusetts relating to vaccination.

The Revised Laws of that commonwealth, chap. 75, § 137, provide that 'the board of health of a city or town, if, in its opinion, it is necessary for the public health or safety, shall require and enforce the vaccination and revaccination of all the inhabitants thereof, and shall provide them with the means of free vaccination. Whoever, being over twenty-one years of age and not under guardianship, refuses or neglects to comply with such requirement shall forfeit $5.'

An exception is made in favor of 'children who present a certificate, signed by a registered physician, that they are unfit subjects for vaccination.' § 139.

Proceeding under the above statutes, the board of health of the city of Cambridge, Massachusetts, on the 27th day of February, 1902, adopted the following regulation: 'Whereas, smallpox has been prevalent to some extent in the city of Cambridge, and still continues to increase; and whereas, it is necessary for the speedy extermination of the disease that all persons not protected by vaccination should be vaccinated; and whereas, in the opinion of the board, the public health and safety require the vaccination or revaccination of all the inhabitants of Cambridge; be it ordered, that all the inhabitants habitants of the city who have not been successfully vaccinated since March 1st, 1897, be vaccinated or revaccinated.'

Subsequently, the board adopted an additional regulation empowering a named physician to enforce the vaccination of persons as directed by the board at its special meeting of February 27th.

The above regulations being in force, the plaintiff in error, Jacobson, was proceeded against by a criminal complaint in one of the inferior courts of Massachusetts. The complaint charged that on the 17th day of July, 1902, the board of health of Cambridge, being of the opinion that it was

necessary for the public health and safety, required the vaccination and revaccination of all the inhabitants thereof who had not been successfully vaccinated since the 1st day of March, 1897, and provided them with the means of free vaccination; and that the defendant, being over twenty-one years of age and not under guardianship, refused and neglected to comply with such requirement.

The defendant, having been arraigned, pleaded not guilty. The government put in evidence the above regulations adopted by the board of health, and made proof tending to show that its chairman informed the defendant that, by refusing to be vaccinated, he would incur the penalty provided by the statute, and would be prosecuted therefor; that he offered to vaccinate the defendant without expense to him; and that the offer was declined, and defendant refused to be vaccinated.

The prosecution having introduced no other evidence, the defendant made numerous offers of proof. But the trial court ruled that each and all of the facts offered to be proved by the defendant were immaterial, and excluded all proof of them.

The defendant, standing upon his offers of proof, and introducing no evidence, asked numerous instructions to the jury, among which were the following:

That § 137 of chapter 75 of the Revised Laws of Massachusetts was in derogation of the rights secured to the defendant by the preamble to the Constitution of the United States, and tended to subvert and defeat the purposes of the Constitution as declared in its preamble;

That the section referred to was in derogation of the rights secured to the defendant by the 14th Amendment of the Constitution of the United States, and especially of the clauses of that amendment providing that no state shall make or enforce any law abridging the privileges or immunities of citizens of the United States, nor deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws; and

That said section was opposed to the spirit of the Constitution.

Each of defendant's prayers for instructions was rejected, and he duly excepted. The defendant requested the court, but the court refused, to instruct the jury to return a verdict of not guilty. And the court instructed structed the jury, in substance, that, if they believed the evidence introduced by the commonwealth, and were satisfied beyond a reasonable doubt that the defendant was guilty of the offense charged in the complaint, they would be warranted in finding a verdict of guilty. A verdict of guilty was thereupon returned.

The case was then continued for the opinion of the supreme judicial court of Massachusetts. Santa F e Pacific Railroad Company, the exceptions, sustained the action of the trial court, and thereafter, pursuant to the verdict of the jury, he was sentenced by the court to pay a fine of $5. And the court ordered that he stand committed until the fine was paid.

Messrs. George Fred Williams and James A. Halloran for plaintiff in error.

Argument of Counsel from pages 14-18 intentionally omitted Messrs. Frederick H. Nash and Herbert Parker for defendant in error.

Argument of Counsel from pages 18-22 intentionally omitted

TOP

Mr. Justice Harlan delivered the opinion of the court:

We pass without extended discussion the suggestion that the particular section of the statute of Massachusetts now in question (§ 137, chap. 75) is in derogation of rights secured by the preamble of the Constitution of the United States. Although that preamble indicates the general purposes for which the people ordained and established the Constitution, it has never been regarded as the source of any substantive power conferred on the government of the United States, or on any of its departments. Such powers embrace only those expressly granted in the body of the Constitution, and such as may be implied from those so granted. Although, therefore, one of the declared objects of the Constitution was to secure the blessings of liberty to all under the sovereign jurisdiction and authority of the United States, no power can be exerted to that end by the United States, unless, apart from the preamble, it be found in some express delegation of power, or in some power to be properly implied therefrom. 1 Story, Const. § 462.

We also pass without discussion the suggestion that the above section of the statute is opposed to the spirit of the Constitution. Undoubtedly, as observed by Chief Justice Marshall, speaking for the court in Sturges v. Crowninshield, 4 Wheat. 122, 202, 4 L. ed. 529, 550, 'the spirit of an instrument, especially of a constitution, is to be respected not less than its letter; yet the spirit is to be collected chiefly from its words.' We have no need in this case to go beyond the plain, obvious meaning of the words in those provisions of the Constitution which, it is contended, must control our decision.

What, according to the judgment of the state court, are the scope and effect of the statute? What results were intended to be accomplished by it? These questions must be answered.

The supreme judicial court of Massachusetts said in the present case: 'Let us consider the offer of evidence which was made by the defendant Jacobson. The ninth of the propositions which he offered to prove, as to what vaccination consists of, is nothing more than a fact of common knowledge, upon which the statute is founded, and proof of it was unnecessary and immaterial. The thirteenth and fourteenth involved matters depending upon his personal opinion, which could not be taken as correct, or given effect, merely because he made it a ground of refusal to comply with the requirement. Moreover, his views could not affect the validity of the statute, nor entitle him to be excepted from its provisions. Com. v. Connolly, 163 Mass. 539, 40 N. E. 862; Com. v. Has, 122 Mass. 40; Reynolds v. United States, 98 U. S. 145, 25 L. ed. 244; Reg. v. Downes, 13 Cox, C. C. 111. The other eleven propositions all relate to alleged injurious or dangerous effects of vaccination. The defendant 'offered to prove and show be competent evidence' these socalled facts. Each of them, in its nature, is such that it cannot be stated as a truth, otherwise than as a matter of opinion. The only 'competent evidence' that could be presented to the court to prove these propositions was the testimony of experts, giving their opinions. It would not have been competent to introduce the medical history of individual cases. Assuming that medical experts could have been found who would have testified in support of these propositions, and that it had become the duty of the judge, in accordance with the law as stated in Com. v. Anthes, 5 Gray, 185, to instruct the jury as to whether or not the statute is constitutional, he would have been obliged to consider the evidence in connection with facts of common knowledge, which the court will always regard in passing upon the constitutionality of a statute. He would have considered this testimony

of experts in connection with the facts that for nearly a century most of the members of the medical profession have regarded vaccination, repeated after intervals, as a preventive of smallpox; that, while they have recognized the possibility of injury to an individual from carelessness in the performance of it, or even in a conceivable case without carelessness, they generally have considered the risk of such an injury too small to be seriously weighed as against the benefits coming from the discreet and proper use of the preventive; and that not only the medical profession and the people generally have for a long time entertained these opinions, but legislatures and courts have acted upon them with general unanimity. If the defendant had been permitted to introduce such expert testimony as he had in support of these several propositions, it could not have changed the result. It would not have justified the court in holding that the legislature had transcended its power in enacting this statute on their judgment of what the welfare of the people demands.' Com. v. Jacobson, 183 Mass. 242, 66 N. E. 719.

While the mere rejection of defendant's offers of proof does not strictly present a Federal question, we may properly regard the exclusion of evidence upon the ground of its incompetency or immateriality under the statute as showing what, in the opinion of the state court, are the scope and meaning of the statute. Taking the above observations of the state court as indicating the scope of the statute,—and such is our duty. Leffingwell v. Warren, 2 Black, 599, 603, 17 L. ed. 261. 262; Morley v. Lake Shore & M. S. R. Co. 146 U. S. 162, 167, 36 L. ed. 925, 928, 13 Sup. Ct. Rep. 54; Tullis v. Lake Erie & W. R. Co. 175 U. S. 348, 44 L. ed. 192, 20 Sup. Ct. Rep. 136; W. W. Cargill Co. v. Minnesota, 180 U. S. 452, 466, 45 L. ed. 619, 625, 21 Sup. Ct. Rep. 423,—we assume, for the purposes of the present inquiry, that its provisions require, at least as a general rule, that adults not under the guardianship and remaining within the limits of the city of Cambridge must submit to the regulation adopted by the board of health. Is the statute, so construed, therefore, inconsistent with the liberty which the Constitution of the United States secures to every person against deprivation by the state?

The authority of the state to enact this statute is to be referred to what is commonly called the police power,—a power which the state did not surrender when becoming a member of the Union under the Constitution. Although this court has refrained frained from any attempt to define the limits of that power, yet it has distinctly recognized the authority of a state to enact quarantine laws and 'health laws of every description;' indeed, all laws that relate to matters completely within its territory and which do not by their necessary operation affect the people of other states. According to settled principles, the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety. Gibbons v. Ogden, 9 Wheat. 1, 203, 6 L. ed. 23, 71; Hannibal & St. J. R. Co. v. Husen, 95 U. S. 465, 470, 24 L. ed. 527, 530; Boston Beer Co. v. Massachusetts, 97 U. S. 25, 24 L. ed. 989;New Orleans Gaslight Co. v. Louisiana Light & H. P. & Mfg. Co. 115 U. S. 650, 661, 29 L. ed. 516, 520, 6 Sup. Ct. Rep. 252; Lawson v. Stecle, 152 U. S. 133, 38 L. ed. 385, 14 Sup. Ct. Rep. 499. It is equally true that the state may invest local bodies called into existence for purposes of local administration with authority in some appropriate way to safeguard the public health and the public safety. The mode or manner in which those results are to be accomplished is within the discretion of the state, subject, of course, so far as Federal power is concerned, only to the condition that no rule prescribed by a state, nor any regulation adopted by a local governmental agency acting under the sanction of state legislation, shall contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument. A

local enactment or regulation, even if based on the acknowledged police powers of a state, must always yield in case of conflict with the exercise by the general government of any power it possesses under the Constitution, or with any right which that instrument gives or secures. Gibbons v. Ogden, 9 Wheat. 1, 210, 6 L. ed. 23, 73; Sinnot v. Davenport, 22 How. 227, 243, 16 L. ed. 243, 247; Missouri, K. & T. R. Co. v. Haber, 169 U. S. 613, 626, 42 L. ed. 878, 882, 18 Sup. Ct. Rep. 488.

We come, then, to inquire whether any right given or secured by the Constitution is invaded by the statute as interpreted by the state court. The defendant insists that his liberty is invaded when the state subjects him to fine or imprisonment for neglecting or refusing to submit to vaccination; that a compulsory vaccination law is unreasonable, arbitrary, and oppressive, and, therefore, hostile to the inherent right of every freeman to care for his own body and health in such way as to him seems best; and that the execution of such a law against one who objects to vaccination, no matter for what reason, is nothing short of an assault upon his person. But the liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others. This court has more than once recognized it as a fundamental principle that 'persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state; of the perfect right of the legislature to do which no question ever was, or upon acknowledged general principles ever can be, made, so far as natural persons are concerned.' Hannibal & St. J. R. Co. v. Husen, 95 U. S. 465, 471, 24 L. ed. 527, 530; Missouri, K. & T. R. Co. v. Haber, 169 U. S. 613, 628, 629, 42 L. ed. 878-883, 18 Sup. Ct. Rep. 488; Thorpe v. Rutland & B. R. Co. 27 Vt. 148, 62 Am. Dec. 625. In Crowley v. Christensen, 137 U. S. 86, 89, 34 L. ed. 620, 621, 11 Sup. Ct. Rep. 13, we said: 'The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community. Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will. It is only freedom from restraint under conditions essential to the equal enjoyment of the same right by others. It is, then, liberty regulated by law.' In the Constitution of Massachusetts adopted in 1780 it was laid down as a fundamental principle of the social compact that the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for 'the common good,' and that government is instituted 'for the common good, for the protection, safety, prosperity, and happiness of the people, and not for the profit, honor, or private interests of any one man, family, or class of men.' The good and welfare of the commonwealth, of which the legislature is primarily the judge, is the basis on which the police power rests in Massachusetts. Com. v. Alger, 7 Cush. 84.

Applying these principles to the present case, it is to be observed that the legislature of Massachusetts required the inhabitants of a city or town to be vaccinated only when, in the opinion of the board of health, that was necessary for the public health or the public safety. The authority to determine for all what ought to be done in such an emergency must have been lodged

somewhere or in some body; and surely it was appropriate for the legislature to refer that question, in the first instance, to a board of health composed of persons residing in the locality affected, and appointed, presumably, because of their fitness to determine such questions. To invest such a body with authority over such matters was not an unusual, nor an unreasonable or arbitrary, requirement. Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members. It is to be observed that when the regulation in question was adopted smallpox, according to the recitals in the regulation adopted by the board of health, was prevalent to some extent in the city of Cambridge, and the disease was increasing. If such was the situation,—and nothing is asserted or appears in the record to the contrary,—if we are to attach, any value whatever to the knowledge which, it is safe to affirm, in common to all civilized peoples touching smallpox and the methods most usually employed to eradicate that disease, it cannot be adjudged that the present regulation of the board of health was not necessary in order to protect the public health and secure the public safety. Smallpox being prevalent and increasing at Cambridge, the court would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case. We say necessities of the case, because it might be that an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons. Wisconsin, M. & P. R. Co. v. Jacobson, 179 U. S. 287, 301, 45 L. ed. 194, 201, 21 Sup. Ct. Rep. 115; 1 Dill. Mun. Corp. 4th ed. §§ 319-325, and authorities in notes; Freurid, Police Power, §§ 63 et seq. In Hannibal & St. J. R. Co. v. Husen, 95 U. S. 465, 471-473, 24 L. ed. 527, 530, 531, this court recognized the right of a state to pass sanitary laws, laws for the protection of life, liberty, health, or property within its limits, laws to prevent persons and animals suffering under contagious or infectious diseases, or convicts, from coming within its borders. But, as the laws there involved went beyond the necessity of the case, and, under the guise of exerting a police power, invaded the domain of Federal authority, and violated rights secured by the Constitution, this court deemed it to be its duty to hold such laws invalid. If the mode adopted by the commonwealth of Massachusetts for the protection of its local communities against smallpox proved to be distressing, inconvenient, or objectionable to some,—if nothing more could be reasonably affirmed of the statute in question,—the answer is that it was the duty of the constituted authorities primarily to keep in view the welfare, comfort, and safety of the many, and not permit the interests of the many to be subordinated to the wishes or convenience of the few. There is, of course, a sphere within which the individual may assert the supremacy of his own will, and rightfully dispute the authority of any human government, especially of any free government existing under a written constitution, to interfere with the exercise of that will. But it is equally true that in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand. An American citizen arriving at an American port on a vessel in which, during the voyage, there had been cases of yellow fever or Asiatic cholera, he, although apparently free from disease himself, may yet, in some circumstances, be held in quarantine against his will on board of such vessel or in a quarantine station, until it be ascertained by inspection, conducted with due

diligence, that the danger of the spread of the disease among the community at large has disappeared. The liberty secured by the 14th Amendment, this court has said, consists, in part, in the right of a person 'to live and work where he will' (Allgeyer v. Louisiana, 165 U. S. 578, 41 L. ed. 832, 17 Sup. Ct. Rep. 427); and yet he may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country, and risk the chance of being shot down in its defense. It is not, therefore, true that the power of the public to guard itself against imminent danger depends in every case involving the control of one's body upon his willingness to submit to reasonable regulations established by the constituted authorities, under the sanction of the state, for the purpose of protecting the public collectively against such danger.

It is said, however, that the statute, as interpreted by the state court, although making an exception in favor of children certified by a registered physician to be unfit subjects for vaccination, makes no exception in case of adults in like condition. But this cannot be deemed a denial of the equal protection of the laws to adults; for the statute is applicable equally to all in like condition, and there are obviously reasons why regulations may be appropriate for adults which could not be safely applied to persons of tender years.

Looking at the propositions embodied in the defendant's rejected offers of proof, it is clear that they are more formidable by their number than by their inherent value. Those offers in the main seem to have had no purpose except to state the general theory of those of the medical profession who attach little or no value to vaccination as a means of preventing the spread of smallpox, or who think that vaccination causes other diseases of the body. What everybody knows the court must know, and therefore the state court judicially knew, as this court knows, that an opposite theory accords with the common belief, and is maintained by high medical authority. We must assume that, when the statute in question was passed, the legislature of Massachusetts was not unaware of these opposing theories, and was compelled, of necessity, to choose between them. It was not compelled to commit a matter involving the public health and safety to the final decision of a court or jury. It is not part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease. That was for the legislative department to determine in the light of all the information it had or could obtain. It could not properly abdicate its function to guard the public health and safety. The state legislature proceeded upon the theory which recognized vaccination as at least an effective, if not the best-known, way in which to meet and suppress the evils of a smallpox epidemic that imperiled an entire population. Upon what sound principles as to the relations existing between the different departments of government can the court review this action of the legislature? If there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution. Mugler v. Kansas, 123 U. S. 623, 661, 31 L. ed. 205, 210, 8 Sup. Ct. Rep. 273; Minnesota v. Barber, 136 U. S. 313, 320, 34 L. ed. 455, 458, 3 Inters. Com. Rep. 185, 10 Sup. Ct. Rep. 862; Atkin v. Kansas, 191 U. S. 207, 223, 48 L. ed. 148, 158, 24 Sup. Ct. Rep. 124.

Whatever may be thought of the expediency of this statute, it cannot be affirmed to be, beyond question, in palpable conflict with the Constitution. Nor, in view of the methods employed to stamp out the disease of smallpox, can anyone confidently assert that the means prescribed by the state to that end has no real or substantial relation to the protection of the public health and the public safety. Such an assertion would not be consistent with the experience of this and other countries whose authorities have dealt with the disease of smallpox. And the principle of vaccination as a means to prevent the spread of smallpox has been enforced in many states by statutes making the vaccination of children a condition of their right to enter or remain in public schools. Blue v. Beach, 155 Ind. 121, 50 L. R. A. 64, 80 Am. St. Rep. 195, 56 N. E. 89; Morris v. Columbus, 102 Ga. 792, 42 L. R. A. 175, 66 Am. St. Rep. 243, 30 S. E. 850; State v. Hay, 126 N. C. 999, 49 L. R. A. 588, 78 Am. St. Rep. 691, 35 S. E. 459; Abeel v. Clark, 84 Cal. 226, 24 Pac. 383; Bissell v. Davison, 65 Conn. 183, 29 L. R. A. 251, 32 Atl. 348; Hazen v. Strong, 2 Vt. 427; Duffield v. Williamsville School District, 162 Pa. 476, 25 L. R. A. 152, 29 Atl. 742.

The latest case upon the subject of which we are aware is Viemester v. White, decided very recently by the court of appeals of New York. That case involved the validity of a statute excluding from the public schools all children who had not been vacinated. One contention was that the statute and the regulation adopted in exercise of its provisions was inconsistent with the rights, privileges, and liberties of the citizen. The contention was overruled, the court saying, among other things: 'Smallpox is known of all to be a dangerous and contagious disease. If vaccination strongly tends to prevent the transmission or spread of this disease, it logically follows that children may be refused admission to the public schools until they have been vaccinated. The appellant claims that vaccination does not tend to prevent smallpox, but tends to bring about other diseases, and that it does much harm, with no good. It must be conceded that some laymen, both learned and unlearned, and some physicians of great skill and repute, do not believe that vaccination is a preventive of smallpox. The common belief, however, is that it has a decided tendency to prevent the spread of this fearful disease, and to render it less dangerous to those who contract it. While not accepted by all, it is accepted by the mass of the people, as well as by most members of the medical profession. It has been general in our state, and in most civilized nations for generations. It is generally accepted in theory, and generally applied in practice, both by the voluntary action of the people, and in obedience to the command of law. Nearly every state in the Union has statutes to encourage, or directly or indirectly to require, vaccination; and this is true of most nations of Europe. . . . A common belief, like common knowledge, does not require evidence to establish its existence, but may be acted upon without proof by the legislature and the courts.. . . The fact that the belief is not universal is not controlling, for there is scarcely any belief that is accepted by everyone. The possibility that the belief may be wrong, and that science may yet show it to be wrong, is not conclusive; for the legislature has the right to pass laws which, according to the common belief of the people, are adapted to prevent the spread of contagious diseases. In a free country, where the government is by the people, through their chosen representatives, practical legislation admits of no other standard of action, for what the people believe is for the common welfare must be accepted as tending to promote the common welfare, whether it does in fact or not. Any other basis would conflict with the spirit of the Constitution, and would sanction measures opposed to a Republican form of government. While we do not decide, and cannot decide, that vaccination is a preventive of smallpox, we take judicial notice of the fact that this is the common

belief of the people of the state, and, with this fact as a foundation, we hold that the statute in question is a health law, enacted in a reasonable and proper exercise of the police power.' 179 N. Y. 235, 72 N. E. 97.

Since, then, vaccination, as a means of protecting a community against smallpox, finds strong support in the experience of this and other countries, no court, much less a jury, is justified in disregarding the action of the legislature simply because in its or their opinion that particular method was perhaps, or possibly—not the best either for children or adults.

Did the offers of proof made by the defendant present a case which entitled him, while remaining in Cambridge, to claim exemption from the operation of the statute and of the regulation adopted by the board of health? We have already said that his rejected offers, in the main, only set forth the theory of those who had no faith in vaccination as a means of preventing the spread of smallpox, or who thought that vaccination, without benefiting the public, put in peril the health of the person vaccinated. But there were some offers which it is contended embodied distinct facts that might properly have been considered. Let us see how this is.

The defendant offered to prove that vaccination 'quite often' caused serious and permanent injury to the health of the person vaccinated; that the operation 'occasionally' resulted in death; that it was 'impossible' to tell 'in any particular case' what the results of vaccination would be, or whether it would injure the health or result in death; that 'quite often' one's blood is in a certain condition of impurity when it is not prudent or safe to vaccinate him; that there is no practical test by which to determine 'with any degree of certainty' whether one's blood is in such condition of impurity as to render vaccination necessarily unsafe or dangerous; that vaccine matter is 'quite often' impure and dangerous to be used, but whether impure or not cannot be ascertained by any known practical test; that the defendant refused to submit to vaccination for the reason that he had, 'when a child,' been caused great and extreme suffering for a long period by a disease produced by vaccination; and that he had witnessed a similar result of vaccination, not only in the case of his son, but in the cases of others.

These offers, in effect, invited the court and jury to go over the whole ground gone over by the legislature when it enacted the statute in question. The legislature assumed that some children, by reason of their condition at the time, might not be fit subjects of vaccination; and it is suggested—and we will not say without reason—that such is the case with some adults. But the defendant did not offer to prove that, by reason of his then condition, he was in fact not a fit subject of vaccination at the time he was informed of the requirement of the regulation adopted by the board of health. It is entirely consistent with his offer of proof that, after reaching full age, he had become, so far as medical skill could discover, and when informed of the regulation of the board of health was, a fit subject of vaccination, and that the vaccine matter to be used in his case was such as any medical practitioner of good standing would regard as proper to be used. The matured opinions of medical men everywhere, and the experience of mankind, as all must know, negative the suggestion that it is not possible in any case to determine whether vaccination is safe. Was defendant exempted from the operation of the statute simply because of his dread of the same evil results experienced by him when a child, and which he had observed in the cases of his son and other children? Could he reasonably claim such an exemption because 'quite often,' or

'occasionally,' injury had resulted from vaccination, or because it was impossible, in the opinion of some, by any practical test, to determine with absolute certainty whether a particular person could be safely vaccinated?

It seems to the court that an affirmative answer to these questions would practically strip the legislative department of its function to care for the public health and the public safety when endangered by epidemics of disease. Such an answer would mean that compulsory vaccination could not, in any conceivable case, be legally enforced in a community, even at the command of the legislature, however widespread the epidemic of smallpox, and however deep and universal was the belief of the community and of its medical advisers that a system of general vaccination was vital to the safety of all.

We are not prepared to hold that a minority, residing or remaining in any city or town where smallpox is prevalent, and enjoying the general protection afforded by an organized local government, may thus defy the will of its constituted authorities, acting in good faith for all, under the legislative sanction of the state. If such be the privilege of a minority, then a like privilege would belong to each individual of the community, and the spectacle would be presented of the welfare and safety of an entire population being subordinated to the notions of a single individual who chooses to remain a part of that population. We are unwilling to hold it to be an element in the liberty secured by the Constitution of the United States that one person, or a minority of persons, residing in any community and enjoying the benefits of its local government, should have the power thus to dominate the majority when supported in their action by the authority of the state. While this court should guard with firmness every right appertaining to life, liberty, or property as secured to the individual by the supreme law of the land, it is of the last importance that it should not invade the domain of local authority except when it is plainly necessary to do so in order to enforce that law. The safety and the health of the people of Massachusetts are, in the first instance, for that commonwealth to guard and protect. They are matters that do not ordinarily concern the national government. So far as they can be reached by any government, they depend, primarily, upon such action as the state, in its wisdom, may take; and we do not perceive that this legislation has invaded any right secured by the Federal Constitution.

Before closing this opinion we deem it appropriate, in order to prevent misapprehension as to our views, to observe—perhaps to repeat a thought already sufficiently expressed, namely—that the police power of a state, whether exercised directly by the legislature, or by a local body acting under its authority, may be exerted in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression. Extreme cases can be readily suggested. Ordinarily such cases are not safe guides in the administration of the law. It is easy, for instance, to suppose the case of an adult who is embraced by the mere words of the act, but yet to subject whom to vaccination in a particular condition of his health or body would be cruel and inhuman in the last degree. We are not to be understood as holding that the statute was intended to be applied to such a case, or, if it was so intended, that the judiciary would not be competent to interfere and protect the health and life of the individual concerned. 'All laws,' this court has said, 'should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter.' United States v. Kirby, 7 Wall. 482, 19 L. ed. 278; Lau Ow

Bew v. United States, 144 U. S. 47, 58, 36 L. ed. 340, 344, 12 Sup. Ct. Rep. 517. Until otherwise informed by the highest court of Massachusetts, we are not inclined to hold that the statute establishes the absolute rule that an adult must be vaccinated if it be apparent or can be shown with reasonable certainty that he is not at the time a fit subject of vaccination, or that vaccination, by reason of his then condition, would seriously impair his health, or probably cause his death. No such case is here presented. It is the cause of an adult who, for aught that appears, was himself in perfect health and a fit subject of vaccination, and yet, while remaining in the community, refused to obey the statute and the regulation adopted in execution of its provisions for the protection of the public health and the public safety, confessedly endangered by the presence of a dangerous disease.

We now decide only that the statute covers the present case, and that nothing clearly appears that would justify this court in holding it to be unconstitutional and inoperative in its application to the plaintiff in error.

The judgment of the court below must be affirmed.

It is so ordered.

Mr. Justice Brewer and Mr. Justice Peckham dissent.

CC∅ | Transformed by Public.Resource.Org

'State-supported facilities for vaccination began in England in 1808 with the National Vaccine Establishment. In 1840 vaccination fees were made payable out of the rates. The first compulsory act was passed in 1853, the guardians of the poor being intrusted with the carrying out of the law; in 1854 the public vacinations under one year of age were 408,824 as against an average of 180,960 for several years before. In 1867 a new act was passed, rather to remove some technical difficulties than to enlarge the scope of the former act; and in 1871 the act was passed which compelled the boards of guardians to appoint vaccination officers. The guardians also appoint a public vaccinator, who must be duly qualified to practise medicine, and whose duty it is to vaccinate (for a fee of one shilling and sixpence) any child resident within his district brought to him for that purpose, to examine the same a week after, to give a certificate, and to certify to the vaccination officer the fact of vaccination or of insusceptibility. . . .

Vaccination was made compulsory in Bavarla in 1807, and subsequently in the following countries: Denmark (1810), Sweden (1814), W urttemberg, Hesse, and other German states (1818), Prussia (1835), Roumania (1874), Hungary (1876), and Servia (1881). It is compulsory by cantonal law in 10 out of the 22 Swiss cantons; an attempt to pass a Federal compulsory law was defeated by a plebiscite in 1881. In the following countries there is no compulsory law, but governmental facilities and compulsion on various classes more or less directly under governmental control, such as soldiers, state employees, apprentices, school pupils, etc.: France, Italy, Spain, Portugal, Belgium. Norway, Austria, Turkey. . . . Vaccination has been compulsory in South Australia since 1872, in Victoria since 1874, and in Western Australia since 1878. In Tasmania a compulsory act was passed in 1882. In New South Wales there is no compulsion, but free facilities for vaccination. Compulsion was adopted at Calcutta in 1880, and since then at 80 other towns of Bengal, at Madras in 1884, and at Bombay and elsewhere in the presidency a few years earlier. Revaccination was made compulsory in Denmark in 1871, and in Roumania in 1874; in Holland it was enacted for all school pupils in 1872. The various laws and administrative orders which had been for many years in force as to vaccination and revaccination in the several German states were consolidated in an imperial statute of 1874.' 24 Encyclopaedia Britannica (1894), Vaccination.

'In 1857 the British Parliament received answers from 552 physicians to questions which were asked them in reference to the utility of vaccination, and only two of these spoke against it. Nothing proves this utility more clearly than the statistics obtained. Especially instructive are those which Flinzer compiled respecting the epidemic in Chemnitz which prevailed in 1870-71. At this time in the town there were 64,255 inhabitants, of whom 53,891, or 83.87 per cent, were vaccinated, 5,712, or 8.89 per cent were unvaccinated, and 4,652, or 7.24 per cent, had had the smallpox before. Of those vaccinated 953, or 1.77 per cent, became affected with smallpox, and of the uninocculated 2,643, or 46.3 per cent, had the disease. In the vaccinated the mortality from the disease was 0.73 per cent, and in the unprotected it was 9.16 per cent. In general, the danger of infection is six times as great, and the mortality 68 times as great, in the unvaccinated, as in the vaccinated.

Statistics derived from the civil population are in general not so instructive as those derived from armies, where vaccination is usually more carefully performed, and where statistics can be more accurately collected. During the Franco-German war (1870-71) there was in France a widespread epidemic of smallpox, but the German army lost

during the campaign only 450 cases, or 58 men to the 100,000; in the French army, however, where vaccination was not carefully carried out, the number of deaths from smallpox was 23,400.' , Johnson's Universal Cyclopaedia (1897), Vaccination.

'The degree of protection afforded by vaccination thus became a question of great interest. Its extreme value was easily demonstrated by statistical researches. In England, in the last half of the eighteenth century, out of every 1,000 deaths, 96 occurred from smallpox; in the first half of the present century, out of every 1,000 deaths, but 35 were caused by that disease. The amount of mortality in a country by smallpox seems to bear a fixed relation to the extent to which vaccination is carried out In all England and Wales, for some years previous to 1853, the proportional mortality by smallpox was 21.9 to 1,000 deaths from all causes; in London it was but 16 to 1,000; in Ireland, where vaccination was much less general, it was 49 to 1,000, while in Connaught it was 60 to 1,000. On the other hand, in a number of European countries where vaccination was more or less compulsory, the proportionate number of deaths from smallpox about the same time varied from 2 per 1,000 of all causes in Bohemia, Lombardy, Venice, and Sweden, to 8.33 per 1,000 in Saxony. Although in many instances persons who had been vaccinated were attacked with smallpox in a more or less modified form, it was noticed that the persons so attacked had been commonly vaccinated many years previously. 16 American Cyclopedia, Vaccination (1883).

'Dr Buchanan, the medical officer of the London Government Board, reported [1881] as the result of statistics that the smallpox death rate among adult persons vaccinated was 90 to a million; whereas among those unvaccinated it was 3,350 to a million; whereas among vaccinated children under five years of age, 42 1/2 per million; whereas among unvaccinated children of the same age it was 5,950 per million.' Hardway, Essentials of Vaccination (1882). The same author reports that, among other conclusions reached by the Academie de Medicine of France, was one that, 'without vaccination, hygienic measures (isolation, disinfection, etc.) are of themselves insufficient for preservation from smallpox.' Ibid.

The Belgian Academy of Medicine appointed a committee to make an exhaustive examination of the whole subject, and among the conclusions reported by them were: 1. 'Without vaccination, hygienic measures and means, whether public or private, are powerless in preserving mankind from smallpox. . . . 3. Vaccination is always an inoffensive operation when

practised with proper care on healthy subjects. . . . 4. It is highly desirable, in the interests of the health and lives of our countrymen, that vaccination should be rendered compulsory.' Edwards, Vaccination (1882.)

The English Royal Commission, appointed with Lord Herschell, the Lord Chancellor of England, at its head, to inquire, among other things, as to the effect of vaccination in reducing the prevalence of, and mortality from, smallpox, reported, after several years of investigation: 'We think that it diminishes the liability to be attacked by the disease; that it modifies the character of the disease and renders it less fatal,—of a milder and less severe type; that the protection it affords against attacks of the disease is greatest during the years immediately succeeding the operation of vaccination.'



Accessibility

About LII

Contact us

Advertise here

Help

Terms of use

Privacy

1  Mark Owens Jordan
2  dba:  Jordan & Associates
   dba:  RE/MAX Preferred Properties
3  BRE 00676018
   2830 Lone Tree Way
4  Antioch, CA  94509
   Tel: (925)757-8080
5  Fax: (925)757-8582
6
   Pro Per
7
                    SUPERIOR COURT OF THE STATE OF CALIFORNIA
8
                         COUNTY OF CONTRA COSTA
9
10  MARK OWENS JORDAN, AN INDIVIDUAL    Case No.: **C 20 - 0 0 9 7 6**
11             Plaintiff,
12  vs.                                 MOTION FOR ORDER OF TEMPORARY
                                        INJUNCTION ENJOING URGENCY
13  CITY OF ANTIOCH, A GENERAL LAW      ORDINANCE NO. 2182-C-S ISSUED BY
14  CITY IN THE STATE OF CALIFORNIA     THE CITY OF ANTIOCH

15             Defendant               Hearing Set
                                       Date: 8/24/2020
16                                     Time: 9:00am
                                       Dept: 23
17

18           Mark Owens Jordan ("Plaintiff") declares as follows:

19                            **I. BACKGROUND**

20           1. Currently there exists within the world, including the United States of America,

21  a virus pandemic.  There exist within the State of California and County of Contra Costa, a

22  health directive to shelter in place.  On March 16, 2020, Governor, Gavin Newsom issued

23  Executive Order N-28-20 to halt evictions, slow foreclosures and protect against utility shut offs.
24
25           2. On March 31, 2020 the City Council of the City of Antioch, California passed

26  an Urgency Ordinance; No. 2182-C-S.  A Moratorium on Temporary Evictions for real property

27  was the initial hearing title.  As part of this Urgency Ordinance the Council of the City of

28  MOTION FOR ORDER OF TEMPORARY INJUNCTION ENJOING URGENCY ORDINANCE NO. 2182-C-S
    ISSUED BY THE CITY OF ANTIOCH - 1

Antioch included a modification to Section 3.F, without notice.  This modification included a 90-day grace period per month of rental payment arrears after expiration or other termination of the ordinance.

3.  The population of the City of Antioch is approximately 112,000.  There are approximately 30,000 residential units in the City of Antioch and there are an unknown number of commercial units.  Based on United States Census figures from 2010 there are approximately 12,000 residential rental units.  There are an unknown number of commercial rental units.  The Urgency Ordinance will cause confusion and adverse results between landlords and tenants.

4.  Making of the Order will prevent immediate and irreparable harm to both landlords and tenants.

5.  Plaintiff alleges that Urgency Ordinance No. 2182-C-S is in violation of the United States Constitution, Articles 5 and 14.

6.  Plaintiff alleges that Urgency Ordinance No. 2182-C-S is in violation of the State of California Constitution, including but not limited to Article 1, Section 9.

7.  Plaintiff alleges that Urgency Ordinance No. 2182-C-S exceeds the authority of the Municipality and that Defendant holds no capacity to enact an ordinance that interferes in private contracts.

8.  Plaintiff alleges that in adoption of the Urgency Ordinance No. 2182-C-S the City Council members violated their oath of office and committed a criminal act.

## II. RELIEF OF THE COURT

18.  The relief requested by the Plaintiff is an Order of Temporary Injunction enjoining the urgency Ordinance No. 2182-C-s issued by the City of Antioch.

MOTION FOR ORDER OF TEMPORARY INJUNCTION ENJOING URGENCY ORDINANCE NO. 2182-C-S ISSUED BY THE CITY OF ANTIOCH - 2

### III. DECLARATION

The nature of the relief to Plaintiff and all other non-owner occupied properties should not require notice to Defendant because Defendant's action if allowed to commence will cause confusion and adverse results between landlords and tenants.

The same is true of my own knowledge.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated:

Mark Owens Jordan

Pro Per

MOTION FOR ORDER OF TEMPORARY INJUNCTION ENJOING URGENCY ORDINANCE NO. 2182-C-S
ISSUED BY THE CITY OF ANTIOCH - 3

1    Mark Owens Jordan
2    dba:  Jordan & Associates
     dba:  RE/MAX Preferred Properties
3    BRE 00676018
     2830 Lone Tree Way
4    Antioch, CA  94509
     Tel: (925)757-8080
5    Fax: (925)757-8582

6    Pro Per

7                       SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                             COUNTY OF CONTRA COSTA
9

10   MARK OWENS JORDAN, AN INDIVIDUAL        Case No.:

11              Plaintiff,

12   vs.                                     ORDER OF TEMPORARY INJUNCTION
                                             ENJOING URGENCY ORDINANCE NO.
13   CITY OF ANTIOCH, A GENERAL LAW          2182-C-S ISSUED BY THE CITY OF
                                             ANTIOCH
14   CITY IN THE STATE OF CALIFORNIA

15              Defendant

16           The Urgency Ordinance No. 2182-C-S issued by the City of Antioch, a general

17   law City in the State of California, is enjoined pursuant to this Temporary Injunction.

18
             It is so ordered.
19

20

21           DATED:              Signed: _____

22                               Judge or Clerk of the Court

23

24

25

26

27

28   ORDER OF TEMPORARY INJUNCTION ENJOING URGENCY ORDINANCE NO. 2182-C-S ISSUED BY
     THE CITY OF ANTIOCH - 1

SUPERIOR COURT - MARTINEZ
COUNTY OF CONTRA COSTA
MARTINEZ, CA, 94553

JORDAN VS CITY OF ANTIOCH

NOTICE OF CASE MANAGEMENT CONFERENCE                    CIVMSC20-00976

1.  NOTICE: THE CASE MANAGEMENT CONFERENCE HAS BEEN SCHEDULED FOR:

DATE:  10/16/20     DEPT:  23     TIME:    8:30

THIS FORM, A COPY OF THE NOTICE TO PLAINTIFFS, THE ADR INFORMATION
SHEET, A BLANK CASE MANAGEMENT CONFERENCE QUESTIONNAIRE, AND A BLANK
STIPULATION FORM ARE TO BE SERVED ON OPPOSING PARTIES.  ALL PARTIES
SERVED WITH SUMMONS AND COMPLAINT/CROSS-COMPLAINT OR THEIR ATTORNEY
OF RECORD MUST APPEAR.

2.  You may stipulate to an earlier Case Management Conference.  If
all parties agree to an early Case Management Conference, please
contact the Court Clerk's Office at (925)608-1000 for Unlimited Civil
and Limited Civil cases for assignment of an earlier date.

3.  You must be familiar with the case and be fully prepared to par-
ticipate effectively in the Case Management Conference and to discuss
the suitability of this case for the EASE Program, private mediation,
binding or non-binding arbitration, and/or use of a Special Master.

4.  At any Case Management Conference the court may make pretrial
orders including the following:

        a.  an order establishing a discovery schedule
        b.  an order referring the case to arbitration
        c.  an order transferring the case to limited jurisdiction
        d.  an order dismissing fictitious defendants
        e.  an order scheduling exchange of expert witness information
        f.  an order setting subsequent conference and the trial date
        g.  an order consolidating cases
        h.  an order severing trial of cross-complaints or bifurcating
            issues
        i.  an order determining when demurrers and motions will be filed

                            SANCTIONS
If you do not file the Case Management Conference Questionnaire or
attend the Case Management Conference or participate effectively in
the Conference, the court may impose sanctions (including dismissal of
the case and payment of money).

        Clerk of the Superior Court of Contra Costa County
I declare under penalty of perjury that I am not a party to this
action, and that I delivered or mailed a copy of this notice to the
person representing the plaintiff/cross-complainant.

Dated:  06/01/20
                              _____
                              BROOKE POOL
                              Deputy Clerk of the Court

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mark Owens Jordan
dba:  Jordan & Associates
dba:  RE/MAX Preferred Properties
BRE 00676018
2830 Lone Tree Way
Antioch, CA  94509
Tel: (925)757-8080
Fax: (925)757-8582

Pro Per

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF CONTRA COSTA

| MARK OWENS JORDAN, AN INDIVIDUAL<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF ANTIOCH, A GENERAL LAW CITY IN THE STATE OF CALIFORNIA<br><br>Defendant | Case No.:  MSC20-00976<br><br>EX-PARTE MOTION FOR ORDER OF TEMPORARY INJUNCTION ENJOING URGENCY ORDINANCE NO. 2182-C-S ISSUED BY THE CITY OF ANTIOCH |
| --- | --- |

Mark Owens Jordan ("Plaintiff") declares as follows:

## I. INTRODUCTION

1.  I believe in the "Rule of Law".  I believe in the "Social Contract".  I believe in the Constitution of the United States of America.  And, I believe in the Constitution of the State of California.

## II. BACKGROUND

2.  Currently there exists within the world, including the United States of America, a virus pandemic.  There existed within the State of California and County of Contra Costa, a health directive to shelter in place.  On March 16, 2020, Governor, Gavin Newsom issued

EX-PARTE MOTION FOR ORDER OF TEMPORARY INJUNCTION ENJOING URGENCY ORDINANCE NO. 2182-C-S ISSUED BY THE CITY OF ANTIOCH - 1

Executive Order N-28-20 (EXHIBIT I) to halt evictions, slow foreclosures and protect against utility shut offs.

      3.  On March 31, 2020 the City Council of the City of Antioch, California passed an Urgency Ordinance; No. 2182-C-S.  A Moratorium on Temporary Evictions for real property was the initial hearing title.  As part of this Urgency Ordinance the Council of the City of Antioch included a modification to Section 3.F, WITHOUT NOTICE.  This modification included a 90-day grace period per month of rental payment arrears after expiration or other termination of the ordinance.

      4.  The population of the City of Antioch is approximately 112,000.  There are approximately 30,000 residential units in the City of Antioch and there are an unknown number of commercial units.  Based on United States Census figures from 2010 there are approximately 12,000 residential rental units.  There are an unknown number of commercial rental units.  The Urgency Ordinance will cause confusion and adverse results between landlords and tenants.

      5.  Making of the Order will prevent immediate and irreparable harm to both landlords and tenants.

      6.  Plaintiff alleges that Urgency Ordinance No. 2182-C-S is in violation of the United States Constitution, Articles 5 and 14.

      7.  Plaintiff alleges that Urgency Ordinance No. 2182-C-S is in violation of the State of California Constitution, including but not limited to Article 1, Section 9.

      8.  Plaintiff alleges that Urgency Ordinance No. 2182-C-S exceeds the authority of the Municipality and that Defendant holds no capacity to enact an ordinance that interferes in private contracts.

9.  Plaintiff alleges that in adoption of the Urgency Ordinance No. 2182-C-S the City Council members violated their oath of office and committed a criminal act.

10.  On June 23, 2020 the City Council held a regularly scheduled meeting for the City of Antioch.  As part of that meeting was Agenda Item 9 (EXHIBIT II) a new Urgency Ordinance "Sunsetting" the Urgency Ordinance No. 2182-C.  Plaintiff is informed and believes that instead of enacting the "Sunsetting" the City Council extended Urgency Ordinance No. 2182-C-S.

11.  Plaintiff is informed and believes and therein alleges that the proposed "Sunsetting" Ordinance drafted by Council of the City of Antioch, stated that other protections existed for Tenants and that by "sunsetting the Urgency Ordinance No. 2182-C-S that clarity would be provided to both Landlords and Tenants.

12.  IT IS NOTED BY PLAINTIFF THAT THE PROPOSED "SUNSETTING" URGENCY ORDINANCE REFERENCES ANTIOCH URGENCY ORDINANCE NO.2181-C-S.  THIS APPEARS TO BE AN ERROR  AS  EXHIBIT I ATTACHED TO THIS MOTION CLEARLY STATES THE ORIGINAL URGENCY ORDINANCE TO BE NO. 2182-C-S.

13.  Therefore, Defendant's action of extension continues the violation of the laws of the United States of America and the State of California.  And, that Defendant's actions shall continue to create confusion and chaos for both Landlords and Tenants.

## II. RELIEF OF THE COURT

14.  The relief requested by the Plaintiff is an Order of Temporary Injunction enjoining the Urgency Ordinance No. 2182-C-s issued by the City of Antioch.

1

### III. DECLARATION

2

The nature of the relief to Plaintiff and all other non-owner occupied properties

3

4

should not require notice to Defendant because Defendant's action if allowed to commence will

cause confusion and adverse results between landlords and tenants.

5

6

The same is true of my own knowledge.

7

I declare under penalty of perjury under the laws of the State of California that the

8

foregoing is true and correct.

9

10

11

Dated:                                           Mark Owens Jordan

12

_____,

13

Pro Per

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EX-PARTE MOTION FOR ORDER OF TEMPORARY INJUNCTION ENJOING URGENCY ORDINANCE NO.
2182-C-S ISSUED BY THE CITY OF ANTIOCH - 4

1  Thomas Lloyd Smith, City Attorney (SBN 314631)
   CityAttorney@ci.Antioch.ca.us
2  City of Antioch
   PO Box 5007
3  Antioch, CA 94531-5007
   Telephone: (925) 779-7015
4                                            EXEMPT FROM FILING FEES
                                             GOV'T CODE § 6103
   Deborah J. Fox (SBN 110929)
5  dfox@meyersnave.com
   David Mehretu (SBN 269398)
6  dmehretu@meyersnave.com
   MEYERS, NAVE, RIBACK, SILVER & WILSON
7  555 12th Street, Suite 1500
   Oakland, California 94607
8  Telephone: (510) 808-2000
   Facsimile: (510) 444-1108
9
   Attorneys for Defendant
10 CITY OF ANTIOCH

11

12             SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                   COUNTY OF CONTRA COSTA

14

15 MARK OWENS JORDAN,                    Case No. C20-00976

16           Plaintiff (pro per),       **ANSWER TO COMPLAINT**

17     v.                               Department:   23

18 CITY OF ANTIOCH,                      Action Filed:      June 1, 2020
                                         Trial Date:        None Set
19           Defendant.

20

21

22

23

24

25

26

27

28
                                                              C20-00976
_____

Defendant, City of Antioch ("Defendant") hereby answers the Complaint of Plaintiff Mark Owens Jordan ("Plaintiff") as follows:[1]

## GENERAL DENIAL

Pursuant to Code of Civil Procedure § 431.30 section (d), Defendant denies each and every allegation of the Complaint, denies liability to Defendant for any damage or injury, and denies that Plaintiff is entitled to any compensatory, injunctive or declaratory relief from the courts.

## AFFIRMATIVE DEFENSES

Defendant pleads the following separate defenses.  Defendant reserves the right to assert additional affirmative defenses that discovery indicates are proper.

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

1.      As a separate and first affirmative defense to the Complaint, and to the purported causes of action set forth therein, Defendant alleges that the Complaint fails to state facts sufficient to constitute a cause of action.

## SECOND AFFIRMATIVE DEFENSE

### (Lack of Standing – No Injury)

2.      As a separate and second affirmative defense to the Complaint, and to the purported causes of action set forth therein, Defendant alleges that Plaintiff lacks standing because Plaintiff has not suffered an injury in fact.

## THIRD AFFIRMATIVE DEFENSE

### (Lack of Standing – Enforcement of Criminal Law)

3.      As a separate and third affirmative defense to the Complaint, and to the purported causes of action set forth therein, Defendant alleges that as a private party, Plaintiff lacks standing to enforce criminal laws.

---

[1] Defendant reserves all rights, and does not waive any rights, to seek removal of this action pursuant to 28 U.S.C. § 1441.

C20-00976

## FOURTH AFFIRMATIVE DEFENSE

### (Failure to File Government Claim)

4.      As a separate and fourth affirmative defense to the Complaint, and to the purported causes of action set forth therein, Defendant alleges that Plaintiff failed to file a government claim pursuant to Government Code section 911.2 *et seq*.

## FIFTH AFFIRMATIVE DEFENSE

### (Discretionary Acts)

5.      As a separate and fifth affirmative defense to the Complaint, and to the purported causes of action set forth therein, Defendant alleges that Defendant is not liable to Plaintiff because the acts complained of in the Complaint constituted one or more discretionary acts.

## SIXTH AFFIRMATIVE DEFENSE

### (Equitable Doctrines)

6.      As a separate and sixth affirmative defense to the Complaint, and to the purported causes of action set forth therein, Defendant alleges that Plaintiff's claims are barred by equitable doctrines, including without limitation waiver, unclean hands, and latches.

## SEVENTH AFFIRMATIVE DEFENSE

### (Estoppel)

7.      As a separate and seventh affirmative defense to the Complaint, and to the purported causes of action set forth therein, Defendant alleges that Plaintiff's claims are barred by reason of Plaintiff's own actions and course of conduct.

## EIGHTH AFFIRMATIVE DEFENSE

### (No Punitive Damages)

8.      As a separate and eighth affirmative defense to the Complaint, and to the purported causes of action set forth therein, Defendant alleges that Plaintiff is not entitled, pursuant to Government Code section 818, to recover punitive damages because Defendant is a public entity.

WHEREFORE, Defendant prays for relief as follows:

1.      That the Complaint be dismissed, with prejudice and in its entirety;

2.      That Plaintiff take nothing by reason of this Complaint and that judgment be

C20-00976

1    entered against Plaintiff and in favor of Defendant;

2           3.      That Defendant be awarded its costs incurred in defending this action;

3           4.      That Defendant be granted its attorneys' fees; and

4           5.      That Defendant be granted such other and further relief as the Court may deem just

5    and proper.

6    DATED:  July 1, 2020                    MEYERS, NAVE, RIBACK, SILVER & WILSON

7

8                                      By: _____

9                                          DAVID MEHRETU
                                           Attorneys for Defendant
10                                         CITY OF ANTIOCH

11

12                              **DEMAND FOR JURY**

13          Defendant demands a jury trial on any issue triable of right by a jury.

14

15   DATED:  July 1, 2020                    MEYERS, NAVE, RIBACK, SILVER & WILSON

16

17                                     By: _____

18                                         DAVID MEHRETU
                                           Attorneys for Defendant
19                                         CITY OF ANTIOCH

20

21

22   3550251

23

24

25

26

27

28

C20-00976

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF SAN DIEGO**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Diego, State of California.  My business address is 101 W. Broadway, Suite 1105, San Diego, CA 92101.

On July 1, 2020, I served true copies of the following document(s) described as **ANSWER TO COMPLAINT** on the interested parties in this action as follows:

Mark Owens Jordan                                    *Plaintiff Pro Per*
2830 Lone Tree Way
Antioch, CA  94509

Email:  Mark@MarkCynthia.com

**BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with the practice of Meyers, Nave, Riback, Silver & Wilson for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  At approximately 12:00 p.m., I caused a copy of the document(s) to be sent from e-mail address zhickman@meyersnave.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 1, 2020, at San Diego, California.

_____
Zilia Hickman

C20-00976

DEFENDANT'S ANSWER TO COMPLAINT